David STEWARD, Petitioner

v.

James GRACE et al., Respondents

No. CIV.A.04–3587.

United States District Court,
E.D. Pennsylvania.

March 30, 2005.

609

David Steward, Huntingdon, PA, pro se.

Kevin Joseph McCloskey, Norristown, PA, for Respondents.

### MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

On June 21, 1986, a jury found Petitioner David Steward guilty of first degree murder and numerous lesser offenses related to the shooting death of Dr. Michael Groll at Groll's residence shortly after midnight on January 1, 1986. Petitioner was sentenced to life imprisonment. After several journeys through the Pennsylvania state appeals processes, Petitioner filed the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.

### I. FACTUAL BACKGROUND

The following factual summary is based on the evidence presented at trial before the Honorable Joseph H. Stanziani of the Montgomery County Court of Common Pleas and is presented in a light most favorable to Respondents James Grace,

the District Attorney of the County of Montgomery and the Attorney General of the Commonwealth of Pennsylvania, the verdict winners:

Shortly after midnight on January 1, 1986, Dr. Michael Groll and his wife Mary Groll were awakened suddenly by two men standing at the foot of their bed in the master bedroom of their home. The men instructed them to roll over. Dr. Groll then propped himself up on his elbow, pointed at the men, and said something to the effect of, "You get out of here." At that point, both men, whom Mrs. Groll described as African–American adult males, pulled out guns and fired. One of the shots struck Dr. Groll in the chest, killing him.[1]

The man at the foot of Dr. Groll's side of the bed, whom Mrs. Groll later identified as Petitioner,[2] then walked around to Mrs. Groll's side of the bed and attempted to pull the rings off her fingers. After she gave him her rings, Petitioner told her he wanted all of her valuables and cash. Mrs. Groll then led Petitioner into her bathroom where she turned on the light and re-trieved an envelope of cash from a drawer. They spent approximately two minutes in the lit bathroom. Despite Petitioner's in-struction to keep her head down, Mrs. Groll clearly observed Petitioner's face and clothing[3] during this time. Petitioner then led Mrs. Groll back to her bed and left with the other intruder,[4] taking with them cash and jewelry worth approximate-ly $2,000.

On January 15, 1986, while Petitioner was already in police custody for an unre-lated charge, Philadelphia Police Officers Daniel Rosenstein and Carol Keenan in-terrogated him about the Groll murder. Detective Rosenstein read Petitioner his *Miranda* rights prior to initiating ques-tioning, and Petitioner agreed to answer questions. Petitioner then orally confess-ed to murdering Dr. Groll. Detective Keenan took notes during the interroga-tion and confession.

After a short break, Detective Rosen-stein again read Petitioner his *Miranda* warnings and then left the interrogation room, leaving Detective Keenan and De-tective Albert Nespoli to resume the in-terrogation and to reduce Petitioner's confession to writing. Detective Keenan recorded Petitioner's responses to the *Mi-randa* warnings, and Petitioner then put his initials on a form next to each answer that Detective Keenan had recorded. De-fendant also signed his name on both pages of the form that contained the *Mi-randa* warnings.

---

1. Although Mrs. Groll testified to seeing only Petitioner fire a gun, the prosecution present-ed other testimony that two shots were fired from different guns, with one shot killing Dr. Groll and the other embedding in the wall above the headboard of the bed. *See e.g.,* 6/17/86 N.T. at 139–144.

2. Mrs. Groll identified Petitioner from a line-up on February 13, 1986. As discussed in Part II, *infra,* the trial court denied Petition-er's Motion to Suppress this identification.

3. Ms. Groll testified that Petitioner was wear-ing "a tan colored windbreaker style jacket that zipped up the front." 6/16/86 N.T. at 37. A jacket fitting this description, along with a

pair of pants and a .38 caliber gun, were later discovered on train tracks in the Grolls' neighborhood. *See id.* at 81. The jacket was admitted into evidence, and Ms. Groll identi-fied it as the one worn by Petitioner. *See id.* at 37–38. The handgun was also admitted into evidence, and the prosecution presented uncontradicted expert testimony that it was the gun that fired the bullet that killed Dr. Groll.

4. This other intruder was Christopher Brigg-man, Petitioner's cousin and co-defendant at trial. The jury found Briggman guilty of sec-ond degree murder in relation to Dr. Groll's death.

Detective Keenan then asked Petitioner some questions about the murder and recorded his answers in narrative form. In this written statement, Petitioner confessed that he and his cousin, Christopher Briggman, broke into the Grolls' house on January 1, 1996. He stated that Mrs. Groll woke up while they were in the bedroom and that her scream woke Dr. Groll. When Dr. Groll told them to get out of his house, they both fired their guns at almost the same time, with at least one of the shots hitting Dr. Groll. The statement further correlated to Mrs. Groll's account of what happened following the shooting with the exception that he stated that he remained in the bedroom while Briggman went with Mrs. Groll into the bathroom. When Detective Keenan finished typing the statement, Petitioner read the statement and signed each page. Petitioner also drew a picture of the position of the persons and furniture in the Grolls' bedroom the night of the murder. Detective Keenan read this written confession into evidence at the trial.

## II. PROCEDURAL HISTORY

On January 15, 1986, after signing his confession, Petitioner was arrested for the murder of Dr. Groll. The Abington Police Department charged Petitioner with first, second and third degree murder, two counts of aggravated assault, five counts of robbery, burglary, theft by unlawful taking, possession of an instrument of crime, criminal conspiracy, receiving stolen property, recklessly endangering another person, and carrying firearms without a license.[5]

Petitioner filed a Motion to Suppress any identification of him by Mrs. Groll and to suppress his confession. On May 19,

1986, the Honorable Joseph Stanziani held a hearing on this motion at which Petitioner was represented by Arthur James, Esquire, who also represented him at the trial. On June 2, 1986, Judge Stanziani read his findings of fact and conclusions of law into the record, finding, *inter alia,* that:

> David Steward's January 15, 1986 statement was given voluntarily, knowingly, intelligently and with full understanding of his Miranda rights and accordingly is properly admissible at trial.
>
> The Commonwealth has shown the voluntariness of the statement by the preponderance of the evidence. Steward's statement was not obtained by coercion, intimidation, false promises or any improper police conduct.
>
> The identification by Mary Groll at the February 13, 1986 lineup was based upon her opportunity to observe the individual while in her bedroom and bathroom [and] was made from an independent recollection. The identification was reliable and not tainted by any improper suggestivity.[6]

Judge Stanziani presided over a jury trial of Petitioner and co-defendant Christopher Briggman commencing on June 16, 1986. On June 23, 1986, the jury found Petitioner guilty of first degree murder, Briggman guilty of second degree murder, and both Defendants guilty of the all of the related charges. The following day the jury sentenced Petitioner to life imprisonment. Attorney James filed a Motion for a New Trial on Petitioner's behalf, arguing only that the Court erred in denying the motion to suppress Petitioner's confession. On July 21, 1987, Judge Stanziani issued an opinion denying Petitioner's motion,

---

5. Petitioner's co-defendant, Christopher Briggman, was later charged with the same crimes.

6. 6/2/86 N.T. at 228–29.

finding that "the preponderance of the evidence clearly demonstrates that Steward knowingly and voluntarily waived his constitutional right to not incriminate himself."[7]

Attorney James timely filed a notice of appeal on Petitioner's behalf, but the Superior Court dismissed the appeal on November 18, 1987, for failure to file a brief.[8] Petitioner then petitioned the Superior Court to have counsel appointed to represent him on appeal, and on February 9, 1988, the Superior Court appointed the Public Defender to represent Petitioner.

Nothing further was docketed on Petitioner's case until July 26, 1996,[9] when Petitioner filed a *pro se* Motion for Post Conviction Collateral Relief in which he requested, *inter alia*, that his appellate rights be reinstated *nunc pro tunc* to the Superior Court of Pennsylvania. The case was assigned to the Honorable William J. Furber, who on September 3, 1996, appointed Frank C. Flick, Esquire, to represent Petitioner on his Post Conviction Relief Act ("PCRA") motion.

On December 4, 1996, Mr. Flick filed a no merit letter[10] and requested permission to withdraw as counsel. Judge Furber filed a notice of his intent to dismiss the PCRA motion without a hearing, and Petitioner filed a *pro se* brief in opposition to dismissal of the motion. On May 9, 1997, Judge Furber granted Mr. Flick leave to withdraw as counsel and dismissed the PCRA motion without a hearing as meritless. On May 28, 1997, Petitioner filed a Notice of Appeal of the May 9, 1997 Order with the Superior Court of Pennsylvania, and the Superior Court affirmed Judge Furber's dismissal on July 1, 1998.

Petitioner appealed the Superior Court's decision, and on November 30, 1999, the Supreme Court of Pennsylvania granted allocatur and remanded the case to the Court of Common Pleas for proceedings consistent with *Commonwealth v. Lantzy*, 558 Pa. 214, 736 A.2d 564 (1999).[11] On

---

7. *Commonwealth v. Briggman*, No. 805–86, slip op. at 4 (Ct.Comm.Pl. July 21, 1987).

8. The record contains a letter dated July 27, 1987 from Attorney James to Petitioner informing him that if he wished to have James draft his appellate brief, he would need to pay a $2,500 retainer. *See* Vol. III, Exh. Q to Respondents' Answer.

9. Although nothing was docketed in this period, Petitioner attaches as Exhibit "A" to his memorandum of law several letters from the Honorable Stanley Ott of the Court of Common Pleas of Montgomery County relating to transcripts of various hearings in Petitioner's case. A letter dated October 28, 1992 from Judge Ott to Petitioner states that Petitioner was provided with copies of the transcripts from the arraignment, suppression hearing and verdict and sentencing, and concludes by telling Petitioner that he "should now have a complete set of trial transcripts." A letter dated December 11, 1992 from Judge Ott to Petitioner states that Petitioner was provided with the criminal complaint, arrest warrant, bills of information, preliminary hearing transcripts and a search warrant. The letter further states that "there are apparently no notes to transcribe as to your attorney's closing argument."

10. *See Commonwealth v. Finley*, 379 Pa.Super. 390, 550 A.2d 213 (1988).

11. In *Lantzy*, the Supreme Court of Pennsylvania held that:

> [W]here there is an unjustified failure to file a requested direct appeal, the conduct of counsel falls beneath the range of competence demanded of attorneys in criminal cases, denies the accused the assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, as well as the right to direct appeal under Article V, Section 9, and constitutes prejudice for purposes of [Title 42,] Section 9543(a)(2)(ii) [of the Pennsylvania Consolidated Statutes Annotated]. Therefore, in such circumstances, and where the remaining requirements of the PCRA are satisfied, the petitioner is not required to

remand, Judge Furber appointed Garrett D. Paige, Esquire, to represent Petitioner on appeal to the Superior Court. On March 13, 2000, Mr. Paige filed a Notice of Appeal, and on April 20, 2000, Mr. Paige filed a concise statement of issues complained of on appeal, raising the following issues:

1. Was not trial counsel, Arthur James, Esquire, ineffective in failing to investigate, and engage an expert to determine and/or confirm the defendant's assertion that the confession as produced at trail [sic], was a fraud, and unauthentic, after defendant informed counsel that he signed "blank sheets of paper," with no typed confession statement thereon?

2. Was not trial counsel, Arthur James, Esquire, ineffective in essentially pleading defendant "guilty" to murder in his closing statement to the jury, without ever discussing same approach with defendant, nor gaining his consent?

3. Did not the Suppression Court err, in not suppressing the typed and oral confession, when defendant was interrogated after he had invoked his right to counsel and had counsel present at the arraignment on an unrelated offense just minutes before the instant alleged confession to murder, and nevertheless was not re-Mirandized, after counsel left?

4. Was not trial counsel, Arthur James, Esquire ineffective for not properly cross examining the Commonwealth witness as to her suggestive out of court identification?

5. Was not the Suppression Court and Trial Court in error in allowing the out of court identification of the "Line Up"

when same was gained through unduly suggestive procedures?

6. Was not the Trial Court in error in not ordering the closing arguments to be transcribed, in a murder case, when the codefendant's transcript was so transcribed?

7. Was not counsel ineffective in not ordering the transcription of the closing arguments so as to preserve all issues on appeal? [12]

On June 28, 2000, Judge Furber issued an opinion denying claims 3, 5, 6 and 7, and recommending that the Superior Court remand for an evidentiary hearing on three of the ineffective assistance claims, numbers 1, 2, and 4, which the opinion concluded were of arguable merit. The opinion affirmed Petitioner's judgment of sentence pending resolution of these ineffective assistance claims.

On April 25, 2001, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence, finding all of Petitioner's arguments meritless and that an evidentiary hearing was unnecessary. The Superior Court denied Petitioner's application for reargument on June 27, 2001. On July 27, 2001, Petitioner filed a petition for allowance of appeal raising the following issues:

1. Should not this court allow an appeal on the basis that pursuant to the Supreme Court's earlier ruling in *Commonwealth v. Lantzy*, 558 Pa. 214, 736 A.2d 564 (1999), this court did direct that a petition for allowance of appeal be granted and that the previous order of Superior Court be reversed and remanded to the Court of Common Pleas of Montgomery County for *proceedings* consistent with *Commonwealth v. Lantzy?*

establish his innocence or demonstrate the merits of the issue or issues which would have been raised on appeal.
736 A.2d at 572.

**12.** *See* Vol. IV, Exh. MM to Respondents' Answer.

2.  Should not this court allow an appeal on the basis that the Superior Court's decision of April 25, 2001 represents a misapprehension of the existing law that exists under Rule 1123 pursuant to post-verdict motions, as a result of the adoption of Rule 1410?

3.  Should not this court allow an appeal on the basis that the Superior Court's decision that a waiver effects as to the failure to order transcripts of closing statements vital to the appellant's direct appeal rights, represents a misapprehension of the rule as applied under Rule 2152 of the Pennsylvania Rules of Appellate Procedure?

4.  Should not this court allow an appeal on the basis that there are questions that require a remand back to the lower court pursuant to PCRA proceedings which even the lower court recognized as being germane including but not limited to the alleged failure to confer with the appellant prior to employing the strategy used in closing statements of pleading him guilty at the closing argument; not cross-examining the victim properly; failure to engage an expert in support of Steward's allegations of fraudulent confession and whether appellant had invoked his right to counsel before any oral confession making said confession inadmissible? [13]

The Supreme Court of Pennsylvania denied this petition for allowance of appeal on December 4, 2001.

On May 14, 2002, Petitioner filed a second *pro se* PCRA Motion and supporting memorandum of law in which he argued that he was entitled to relief on the following grounds:

I.  Suppression Court erred by admitting into evidence a statement that stemmed from an invalid search warrant of January 9, 1986, # E13654.

II.  Suppression & Trial Court erred by allowing a suggestive identification testimony and not giving proper Kloiber instructions.

III.  Suppression Court erred by admitting into evidence a statement by petitioner after invoking his Fifth Amendment right to counsel.

IV.  Commonwealth violated Brady when they failed to disclose test results of hair analyses tests conducted from various search warrants, specifically the one in which the Commonwealth ordered the extraction of hair from petitioner's head to be tested (DNA).

V.  Commonwealth violated Brady when they concealed the fact that petitioner's statement was prefabricated and not correcting the false testimonies of the two Philadelphia Detectives just to obtain a conviction.

VI.  Petitioner was constructively denied his Sixth Amendment right to assistance of counsel during the time when trail [sic] counsel conceded to petitioner's guilt during closing argument.

VII.  Trail [sic] Counsel's failure to investigate the fact that the Hair Analyses tests not only was inconclusive but in fact exclusive.

VIII  Trail [sic] Counsel's failure to investigate through a Forensic Document Examiner that the alleged confession was indeed prefabricated.

IX.  Trial Counsel's failure to investigate the fact that the Philadelphia Homicide Dectectives [sic], specifi-

---

**13.** *See* Vol. IV, Exh. TT to Respondents' Answer.

cally Detective Daniel Rosenstein has a history of prefabricating confessions.

X. All prior counsels were ineffective for failing to preserve, develop and litigate issues which have merit.

XI. PCRA Court erred by preventing petitioner from establishing evidence of ineffectiveness and allowing the record to go up to Superior Court undeveloped and incomplete without an [sic] hearing, when there were issues of merit that were in dispute.[14]

Simultaneously to his PCRA Motion, Petitioner filed a Motion for Discovery and Results of Physical and/or Scientific Tests and Reports, a Motion for DNA Testing, a Motion for Leave to Proceed in Forma Pauperis, a Motion for Appointment of Counsel, and a Statement in Absence of Transcript pursuant to Pennsylvania Rule of Appellate Procedure 1923.

On May 30, 2002, the PCRA Court appointed Henry Hilles, III, Esquire, to represent Petitioner on his PCRA Motion. On September 23, 2002, Mr. Hilles filed a Petition to Withdraw as Counsel with a no merit letter [15] attached. The PCRA Court filed a notice of its intent to dismiss the PCRA motion without a hearing, and Petitioner filed a *pro se* brief in opposition to dismissal of his PCRA motion. On December 16, 2002, the PCRA Court granted Mr. Hilles leave to withdraw as counsel and dismissed the PCRA motion without a hearing. On December 31, 2002, Petitioner filed a Notice of Appeal to the Superior Court of Pennsylvania, and on January 16, 2003, filed a Concise Statement of Matters Complained of on Appeal which contained the following:

1. Did the PCRA Court err when it denied defendant the opportunity to reconstruct the record, which is missing, specifically, trial attorney Arthur H. James' closing argument, in which defendant submitted his 1923 statement and exhibits in his pro se PCRA brief and again when filing this Notice of Appeal; after Superior Court had previously recommended him to do so?

2. Did the PCRA Court err when it denied defendant's request for Post–Conviction DNA testing, pursuant to S.B. 589, in which scientific tests were preformed [sic] prior to trial in 1986, but the results were never used to establish defendant's innocence?

3. Did PCRA Court abuse its discretion in failing to conduct an evidentiary hearing once defendant's case was reversed and remanded in accordance with *Commonwealth v. Lantzy,* and allowing disputed issues to go up to Superior Court unlitigated?

4. Was not trial counsel, Arthur H. James, Esquire, ineffective in essentially pleading defendant "guilty" to murder in his closing summation to the jury, without ever discussing same approach with defendant, nor gaining his consent?

5. Was not appellate counsel, Garrett D. Page, Esquire ineffective for failing to properly raise and litigate claims of ineffectiveness of trial counsel, Arthur H. James, on direct appeal?

6. Was not former PCRA counsel, Henry S. Hilles, III, Esquire, ineffective for filing a "no-merit" letter, and refusing to avail himself of the provisions of Rule of Appellate Procedure 1923 and claims of ineffectiveness of trial and ap-

---

**14.** The quoted text is the headings from Petitioner's Memorandum of Law in Support of his PCRA Motion. *See* Vol. V, Exh. VV to Respondents' Answer.

**15.** *See Finley,* 379 Pa.Super. 390, 550 A.2d 213.

pellate counsel which were never litigated?[16]

On April 15, 2003, the PCRA Court issued an opinion explaining its December 16, 2002 Order dismissing Petitioner's PCRA Motion without a hearing. This opinion settled and approved Petitioner's Rule 1923 Statement and certified it to the Superior Court as part of the record of the case. The opinion also included Findings of Fact and Conclusions of Law pertaining to the Statement, concluding that Petitioner failed to meet the burden of proof for proving that his trial counsel was ineffective due to his closing argument during the guilt phase of the trial.[17]

On October 20, 2003, the Superior Court affirmed the PCRA Court's decision to dismiss the Petitioner's PCRA Motion without a hearing, relying on the PCRA Court's April 15, 2003 opinion. On May 11, 2004, the Supreme Court of Pennsylvania denied Petitioner's Petition for Allowance of Appeal.

On July 29, 2004, Petitioner filed the instant Petition for Writ of Habeas Corpus. On the same date, Petitioner also filed a Motion for Discovery. The undersigned referred the Petition to Magistrate Judge Linda K. Caracappa for a Report and Recommendation ("R & R"), and on November 10, 2004, Magistrate Judge Caracappa recommended the Petition be denied and dismissed. On December 2, 2004, Petitioner filed objections to the R & R, which, despite their untimeliness,[18] this Court addresses below.

16. *See* Vol. V, Exh. DDD to Respondents' Answer.

17. *See* Vol. V, Exh. FFF to Respondents' Answer.

18. *See* Local R. Civ. P. 72.1(IV)(b) (giving parties ten (10) days to file objections to an R

## III. DISCUSSION

This Court reviews *de novo* those portions of the R & R to which Petitioner has objected.[19] Petitioner asserts two main objections to the R & R: 1) the R & R applies the incorrect law to Petitioner's claims; and 2) the R & R omits facts relevant to Petitioner's claims. Petitioner also objects to the Magistrate Judge's failure to rule on his Motion for Discovery. The Court addresses each of Petitioner's objections below.

### A. The R & R Applied the Incorrect law to Petitioner's Claims

Petitioner's Objections contain the following heading: "Petitioner objects to the standard of review applied by the magistrate judge to Petitioner's four(4) claims." However, the R & R contains a detailed discussion of the appropriate standard of review under the Antiterrorism and Effective Death Penalty Act of 1996. Petitioner does not object to this standard, and the Court adopts and incorporates that section herein. Instead, under the aforementioned heading of Petitioner's objections, Petitioner essentially disputes the law the R & R utilizes to analyze his claims. Accordingly, the Court addresses these arguments below.

#### 1. Ineffective assistance claim related to Petitioner's trial counsel's closing argument

■ In the R & R, Magistrate Judge Caracappa applies the familiar two prong ineffective assistance test, as set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

& R). In light of the fact that Petitioner is representing himself and is in prison, the Court is lenient in its enforcement of this requirement and overlooks that Petitioner was two days late filing his objections.

19. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[20]

Applying this test, the R & R found that Petitioner had failed to demonstrate that trial counsel's performance was deficient and dismissed the habeas petition as to this claim.

Here, Petitioner argues that his trial counsel's act of pleading Petitioner guilty during closing arguments was so deficient that Petitioner was constructively denied

the assistance of counsel, warranting a presumption of prejudice to Petitioner.[21] In the state court proceedings and in the R & R, despite the unavailability of the transcript of this closing argument, Petitioner's claim was routinely dismissed without a hearing. It was presumed that trial counsel purposefully acknowledged Petitioner's guilt during his closing because the evidence was overwhelmingly against Petitioner, and counsel was trying to protect Petitioner from the death penalty. Thus, according to the state court, because this strategy was reasonable under the circumstances, it did not constitute ineffective assistance of counsel.

In light of the absence of a transcript of counsel's closing arguments,[22] the Court finds that an evidentiary hearing is necessary to decide this issue. Petitioner argues that during closing argument and without Petitioner's consent, his trial counsel told the jury "that Petitioner was guilty of the charges before him, including murder."[23] Without evidence as to what trial

**20.** See also United States v. Smack, 347 F.3d 533, 537 (3d Cir.2003).

**21.** See Roe v. Flores–Ortega, 528 U.S. 470, 483, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("In some cases, however, the defendant alleges not that counsel made specific errors in the course of representation, but rather that during the judicial proceeding he was—either actually or constructively—denied the assistance of counsel altogether. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage.... Under such circumstances, no specific showing of prejudice is required, because the adversary process itself is presumptively unreliable.") (internal citations and quotations omitted); see also United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.").

**22.** The Court finds it perplexing that when Petitioner requested the transcripts of his court proceedings in 1992, the only portion of the proceedings for which the recording was lost was his trial counsel's closing argument.

**23.** Petitioner's Mem. of Law in Supp. of Habeas Petition at 15. To support this claim, Petitioner attached a portion of the transcript from his co-defendant Christopher Briggman's PCRA hearing to both his habeas petition and his second PCRA Motion. At this hearing, the prosecuting attorney at the trial, Thomas E. Waters, Jr., testified as follows:

Q. Can you tell us about the closing argument of Arthur James? I know you can't—I'm sure you can't repeat it verbatim?

A. The characterization that Mr. Kalkbrenner gave it was quite good. In effect, Arthur just said, you know, his client had done it. Of course, he didn't have much choice, the client had given a complete statement. But nonetheless, he literally

counsel said during his closing argument, the Court cannot draw a conclusion as to whether this statement did constitute sound trial strategy. Although we have been unable to find any Supreme Court or Third Circuit authority directly on point, other circuits have found that a trial counsel's concession of his/her client's guilt constitutes ineffective assistance of counsel.[24] Accordingly, the Court shall reassign this matter to Magistrate Judge Caracappa for an evidentiary hearing regarding the content of, and Petitioner's consent to, his trial counsel's closing argument.[25] Petitioner shall be allowed to testify to his own recollection of his counsel's closing argument, present the testimony of the other attorneys involved in his case who were present for the closing, and present any other evidence relating to this issue. Respondents, of course, will be invited to participate fully as well. Once such a hearing has been conducted, the Court will be in a better position to determine whether: 1) trial counsel actually admitted Petitioner's guilt; 2) Petitioner consented to any such admission; and/or 3) such admission could reasonably be classified as sound trial strategy.

---

threw Steward to the jury and said, you know, this guy has no excuse. It's terrible. And then he proceeded to lament his fate if he were in prison for life, because he would be part of the walking dead, et cetera, et cetera.

**24.** *See United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir.1991) ("A lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to 'subject the prosecution's case to meaningful adversarial testing.' ") (quoting *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039); *Francis v. Spraggins*, 720 F.2d 1190, 1194 (11th Cir.1983)("Where a capital defendant, by his testimony as well as his plea, seeks a verdict of not guilty, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury."), *receded from on other grounds, Presnell v. Kemp*, 835 F.2d 1567, 1573 n. 16 (11th Cir.1988); *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir.1981) ("We, therefore, hold that petitioner was deprived of effective assistance of counsel when his own lawyer admitted his clients' guilt, without first obtaining his client's consent to this strategy."); Heidi Woessner, *Criminal Law–The Crucible of Adversarial Testing: Ineffective Assistance of Counsel and Unauthorized Concessions of Client's Guilt*, 24 W. New Eng. L.Rev. 315 (2002) (reviewing the inconsistent precedent on this issue); *cf. Lindstadt v. Keane*, 239 F.3d 191, 202–03 (2d Cir.2001) (counsel's

statement in his opening "that [the defendant] was under no obligation to testify; that, after hearing the state's evidence, [the defendant] and counsel would decide 'whether [the prosecutors] have proven their case'; and that, only 'if they have made their case,' [the defendant] would testify.... reflected no tactical considerations and contributed to defense counsel's constitutional ineffectiveness."); *Clozza v. Murray*, 913 F.2d 1092, 1099 (4th Cir.1992) (" '[C]omplete concession of the defendant's guilt may constitute ineffective assistance of counsel.") (quoting *Francis*, 720 F.2d at 1194); *but cf. Childress v. Johnson*, 103 F.3d 1221, 1229 n. 12 (5th Cir.1997) ("While gleaning insight from *Swanson's* statement of Sixth Amendment principles, we do not necessarily endorse its finding of a constructive denial of counsel. Defense counsel in *Swanson* failed to call witnesses and conceded in his closing argument that the evidence of his client's guilt was overwhelming. These appear to be trial errors amenable to *Strickland* analysis."); *Scarpa v. DuBois*, 38 F.3d 1, 14–15 (1st Cir.1994) (questioning whether the *Swanson* court overextended the Supreme Court's holding in *Cronic* ).

**25.** *See Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir.1987) ("As a general rule in dealing with the merits of a petition for habeas corpus, where there are material facts in dispute which if proven would entitle a petitioner to relief and the petitioner has not been afforded a full and fair evidentiary hearing in state court, either at the time of trial or in a collateral proceeding, a federal habeas court must hold an evidentiary hearing.")

**2. Petitioner's contention that the police fabricated the document containing his signed confession**

█ Petitioner next argues that the R & R did not properly analyze his contention that his written confession was forged, stating that he "is not arguing if the alleged confession was given voluntarily, but, the fact that it is a fake document, where the typewritten statement is an overlay of Petitioner's signature." [26] However, the suppression court heard Petitioner's testimony and that of the police officers who took his confession, and found that Petitioner voluntarily admitted to murdering Dr. Groll and that the written confession was admissible. In so ruling, the court determined by a preponderance of the evidence that the written confession was not a fake document. "Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." [27] Petitioner has not presented clear and convincing evidence that the suppression court's factual determination regarding the authenticity of the written confession was incorrect. Therefore, this claim is without merit.

**B. The R & R's Omission of Relevant Facts**

The Court sustains Petitioner's objection insofar as the procedural background section of the R & R omits certain facts relevant to Petitioner's claim. Accordingly, this Court has conscientiously reviewed the entire record and set forth a more detailed account of the factual background and procedural history above. However, because Petitioner appears to allege that the existence of these facts should have caused the Magistrate Judge to reach different conclusions on the merits of his claims, the Court specifically addresses such facts or set of facts below.

**1. That Petitioner has continuously denied signing a confession**

The record clearly reflects Petitioner's repeated contention that he never signed a confession and instead signed blank pieces of paper on which the police later typed a confession to the Groll murder. However, Petitioner testified to such before the suppression court, and that court nevertheless found the police officers' testimony more credible than Petitioner's, finding the confession to be admissible at trial. Once again, Petitioner has not presented clear and convincing evidence that the state court's credibility determination was incorrect. [28] Nor has Petitioner alleged facts sufficient to entitle him to an evidentiary hearing on this claim because Petitioner's already made these same allegations unsuccessfully before the suppression court. [29]

---

**26.** Objections at 9.

**27.** *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir.2000); 28 U.S.C. § 2254(e)(1).

**28.** *See id.*

**29.** AEDPA restricts Petitioner's entitlement to an evidentiary hearing:
(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
(A) the claim relies on—

(I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Accordingly, Petitioner is not entitled to relief on this ground.

**2. Petitioner filed a Motion for Transcripts and Discovery to the state court in 1992**

■ Petitioner objects to the R & R's failure to note that Petitioner had requested the transcripts from his attorney's closing argument in 1992.[30] This fact relates to Petitioner's claims that the state court denied him the opportunity to present an adequate appeal when it failed to provide him with a complete trial transcripts.[31] The R & R concludes that Petitioner was not deprived of due process of law because he did not timely request the transcripts as required by Pennsylvania law.[32] In light of Petitioner's request in 1992, it appears that Petitioner waited only six years, not ten as the R & R suggests, to request the transcripts. Nevertheless, as the R & R does state, the loss or destruction of the trial transcripts during the six years between Petitioner's trial and his request for the transcripts does not constitute a deprivation of due process of law. Petitioner is denied relief on this ground.

**3. Factual errors relating to the *nunc pro tunc* reinstatement of Petitioner's appeal**

Petitioner claims that the R & R misstates the procedural history of Petition-er's appeal following remand from the Supreme Court of Pennsylvania for proceedings consistent with *Commonwealth v. Lantzy.* Specifically, it appears that Petitioner claims that the R & R does not address the trial court's failure to conduct an evidentiary hearing following remand. A review of the procedural history, as explained in detail in Part II, *supra,* reveals that although the trial court recommended that the Superior Court remand the case for an evidentiary hearing, the Superior Court explicitly addressed this recommendation and found that an evidentiary hearing was not warranted. Any failure of the R & R to explain this procedural history does not impact Petitioner's claims. Therefore, Petitioner is not entitled to relief on this ground.

**4. Test results of hair found on jacket**

■ Petitioner takes issue with the R & R's failure to mention the hair comparison test results from before the trial that Petitioner claims to have first obtained on July 22, 2003, in which hairs found on the jacket allegedly worn by the murderer were compared to and did not match Petitioner's.[33] Because the R & R only addresses test results from a hair fragment found on a

28 U.S.C. § 2254(e)(2); *see also Werts,* 228 F.3d at 196 n. 15 ("The AEDPA also prescribes restrictions on when an evidentiary hearing may be held in a federal habeas case.").

30. This request is detailed in note 9, *supra.*

31. Petitioner has all of the trial transcripts with the exception of his attorney's closing argument. For whatever reason, his attorney's closing argument was not transcribed initially and subsequently the recordings of the trial proceedings were lost.

32. R & R at 11; Pa. R.App. P.1911; *Commonwealth v. Williams,* 552 Pa. 451, 715 A.2d 1101, 1103 (1998) ("Rule 1911 requires ap-pellants to order all transcripts necessary for their appeals.").

33. Attached to Petitioner's Memorandum of Law as Exhibit E is a letter dated June 4, 1986 from FBI laboratory in Washington, D.C. to William Kelly, Chief of Police for the Abington Township Police Department, regarding testing requested by Chief Kelly in a letter dated May 29, 1986. In the June 4, 1986 letter, the FBI concludes that, "No hairs like specimens K11 [from Petitioner] and K12 [from Briggman] were found on specimen Q1 (60123101—jacket)."

handkerchief that the police discovered outside of the Groll residence, and not the test results from the jacket hair, the Court sustains this objection.[34]

Petitioner makes two arguments with respect to the jacket hair: 1) that he is entitled to DNA testing on this hair to prove his innocence; and 2) that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to turn over hair comparison test results that showed that the hair did not match Petitioner's hair.[35] The first argument relates to Petitioner's Motion for Discovery and is discussed in Part III.C., *infra*. The second argument is discussed herein.

Petitioner claims he first discovered the existence of these hair comparison tests on July 22, 2003 as the result of a Freedom of Information Act request. These tests compared the jacket hair to a hair taken from Petitioner pursuant to a search warrant. Unlike the results from the testing on the handkerchief hair fragment, which was "too limited to be of value for signifi-

cant comparison purposes," the tests found that the hair from the jacket matched neither Petitioner's hair nor his co-defendant's.[36] If the search warrant stated that the purpose of obtaining Petitioner's hair was so that these tests could be conducted, Petitioner would have been aware of the existence of these tests at the time of his trial, and there could not be a *Brady* violation.[37] Unfortunately, the search warrant for Petitioner's hair has not been included in the extensive exhibit volumes submitted to the Court by Respondents.

Petitioner first raised this issue in a Petition to Supplement the Record on August 5, 2003, when Petitioner's second PCRA Motion was pending before the Superior Court of Pennsylvania. The Superior Court denied this petition. As a result, no evidentiary hearing has been conducted on the issue of whether the prosecution suppressed these test results. Without such a hearing, this Court cannot properly decide whether a *Brady* violation occurred. Accordingly, the Court must reassign this matter to Magistrate Judge Caracappa to

---

**34.** Frustratingly, Respondents' filings are equally devoid of mention of the test results on the jacket hair, addressing only the handkerchief hair fragment as well.

**35.** In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. "To establish a due process violation under Brady, then, 'a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.'" *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (quoting *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir.1997)).

**36.** Petitioner's PCRA counsel may not have filed his no merit letter had he known about these tests and/or test results. In his no merit

letter to the PCRA court, Mr. Hilles stated that Petitioner's contention of a *Brady* violation lacked merit, but he was only aware of test results on the handkerchief hair fragment. Notably, Mr. Hilles opined that: "if the result was that the hair was not consistent with your hair—or was even inconsistent with the properties of your hair—you could fashion an argument that such information was of a potentially exculpatory nature and was 'material to guilt.'" *See* Vol. V, Exh. ZZ to Respondents' Answer.

**37.** *See Pelullo*, 399 F.3d at 202 ("[W]e are mindful of the well-established principle that 'the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.'") (quoting *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984)).

conduct an evidentiary hearing on the issue of whether the prosecution suppressed the test results, attached as Exhibit "E" to Petitioner's memorandum of law, comparing Petitioner's hair to the hair found on the jacket.

## C. Motion for Discovery

Petitioner objects to Magistrate Judge Caracappa's failure to address his Motion for Discovery. Insofar as Magistrate Judge Caracappa completely ignored this Motion, Petitioner's objection is sustained. We address this Motion below.

■ Under Rule 6(a) of the Rules Governing Section 2254 cases, "a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of such discovery." "Thus a habeas petitioner, unlike the civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. In evaluating requests for discovery in habeas matters, the Supreme Court has held that 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.' "[38]

■ Petitioner's first discovery request is for DNA testing of the hair sample found on the jacket worn by the perpetrator. Petitioner fails, however, to explain how any result of such testing would entitle him to habeas relief on any of his claims. Assuming that DNA tests reveal that the hair on the jacket is not Petitioner's, such a finding would not conclusively establish Petitioner's actual innocence and thus would not entitle Petitioner to any relief.[39] The jacket was found outside and away from the crime scene more than two weeks after the murder, so the hair could have ended up on the jacket in numerous ways either before or after the murder. Accordingly, Petitioner is not entitled to this discovery.[40]

■ Petitioner next requests that a forensic document examiner review his written confession, alleging that this examination would support Petitioner's contention that the document is a fake. Although it is true that expert testimony that Petitioner's written confession was forged would have significantly bolstered Petitioner's case, Petitioner does not contend that an expert has analyzed his confession and determined it to be a forgery. Petitioner also fails to explain why, if such evidence was available, he did not present it at his suppression hearing. This sort of " 'fishing expedition' for evidence to support claims does not constitute good cause for habeas discovery."[41] Accordingly, Petitioner is not entitled to this discovery.

**38.** *Peterkin v. Horn,* 30 F.Supp.2d 513, 516 (E.D.Pa.1998) (quoting *Bracy v. Gramley,* 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997)).

**39.** Because DNA testing did not exist at the time of Petitioner's trial, and because there is no constitutional right to DNA testing, Petitioner would only be entitled to DNA testing here if the results of the testing could conclusively prove his actual innocence. This standard is different from the materiality element of Petitioner's *Brady* claim, where the suppressed evidence must only be material to guilt or punishment.

**40.** The state courts resolved this issue under Title 42, Section 9543.1 of the Pennsylvania Consolidated Statutes Annotated. Whether the state courts properly applied this state rule is not for a federal court to decide on habeas review. This court is limited to reviewing Petitioner's request for DNA testing under the discovery rules applicable to § 2254 cases, as outlined above.

**41.** *Wheeler v. Vaughn,* No. Civ.A.01–428, 2004 WL 73728, at *4 (E.D.Pa. Jan. 6, 2004) (citing *Deputy v. Taylor,* 19 F.3d 1485, 1493 (3d Cir.1994)).

Petitioner also requests all hair examinations performed by the FBI relating to his case and all original statements made by him. Once again, Petitioner fails to allege how such discovery would entitle him to habeas relief. Accordingly, Petitioner's motion is denied on this ground.

■ Petitioner requests the search warrant issued prior to his trial for the extraction of his head hair. Because the Court finds that such evidence will assist the Court in deciding Petitioner's claim that the prosecution's concealment of hair comparison tests was a *Brady* violation, the Court grants Petitioner's motion for discovery of this document.

Finally, Petitioner requests the transcripts of his trial counsel's closing argument at trial. Although this evidence is highly relevant to Petitioner's ineffective assistance claim, in light of the destruction or disappearance of the recordings of this part of Petitioner's trial, the Court must dismiss as moot Petitioner's motion for this discovery.

## IV. CONCLUSION

For the foregoing reasons, the Court reassigns this petition to Magistrate Judge Caracappa for an evidentiary hearing and Report and Recommendation on two issues:

1. Whether the prosecution, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), suppressed evidence of comparison tests finding that Petitioner's hair did not match hair found on the jacket worn by the perpetrator.

2. Whether Petitioner's trial counsel's closing argument constituted ineffective assistance of counsel, entitling Petitioner to habeas relief.

The remainder of Petitioner's claims for relief are denied.

An appropriate Order follows.

### ORDER

**AND NOW,** this 30th day of March, 2005, upon careful consideration of all of the pleadings and the entire record, and after review of the November 10, 2004 Report and Recommendation of United States Magistrate Judge Linda K. Caracappa [Doc. # 12], and Petitioner's Objections thereto [Doc. # 13], and for the reasons set forth in the attached memorandum opinion, it is hereby **ORDERED** as follows:

1. The Report and Recommendation is **REJECTED;**

2. Counsel shall be appointed to represent Petitioner in this matter by separate Order;

3. Petitioner is granted 60 days from the date of this Order to file an Amended Petition for Writ of Habeas Corpus addressing only the two issues that will be the subject of the evidentiary hearing described in paragraph 4 of this Order;

4. The Petition for Writ of Habeas Corpus is **REASSIGNED** to Magistrate Judge Caracappa for an evidentiary hearing and Report and Recommendation on the following two issues:

A. Whether the prosecution, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), suppressed evidence of comparison tests finding that Petitioner's hair did not match hair found on the jacket worn by the perpetrator.

B. Whether Petitioner's trial counsel's closing argument constituted ineffective assistance of counsel, entitling Petitioner to habeas relief.

5. Petitioner's Motion for Discovery [Doc. # 2] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to paragraph 4 of the Motion in which Petitioner requests the following:

"Search Warrant along with Probable Cause issued on or about May 28, 1986, prior to trial, for the extraction of head hair from Petitioner to be compared with unknown hair found on perpetrator's clothing recovered at the crime scene."

Petitioner's Motion is **DENIED** in all other respects.

It is so **ORDERED**.