[920 NE2d 930, 892 NYS2d 823]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SIMON SAMANDAROV, Appellant.

Argued October 21, 2009; decided November 24, 2009

**POINTS OF COUNSEL**

*Law Office of Ronald L. Kuby,* New York City (*Ronald L. Kuby* of counsel), for appellant. I. The trial court erred in denying

defendant's CPL 440.10 motion without a hearing. The motion alleged the *Rosario* material from the People's crucial witness, Jose Ramirez, had not been provided to the defense. (*People v Castillo*, 34 AD3d 221, 8 NY3d 879; *People v Campbell*, 7 AD3d 409, 3 NY3d 672; *People v Poole*, 48 NY2d 144; *People v Baxley*, 84 NY2d 208; *People v Brown*, 56 NY2d 242; *People v Farrell*, 207 AD2d 560; *People v Rahman*, 231 AD2d 745; *People v Robles*, 194 AD2d 750; *People v Oliviery-Perez*, 248 AD2d 645, 91 NY2d 1011; *People v Bacchi*, 186 AD2d 663, 81 NY2d 760.) II. The jurors' speculation about defendant's link to the Eduard Nektalov murder and Russian organized crime, and the jurors' fears of the courtroom audience looking at their faces may have prejudiced substantial rights of defendant and the trial court abused its discretion by denying the CPL 330.30 (2) motion without a hearing. (*People v Gardella*, 55 AD2d 607; *People v Shuler*, 55 AD2d 609; *People v Magnano*, 175 AD2d 639, 79 NY2d 860; *People v Rivera*, 304 AD2d 841; *People v Lavender*, 117 AD2d 253, 68 NY2d 995; *People v Maragh*, 94 NY2d 569; *People v Brown*, 48 NY2d 388.)

*Richard A. Brown, District Attorney,* Kew Gardens (*Laura T. Ross* and *John M. Castellano* of counsel), for respondent. I. The Appellate Division correctly held that defendant was not entitled to a hearing on his CPL 440.10 motion, because defendant failed to proffer sufficient support for his claim that a *Rosario* violation occurred and that he was prejudiced. (*People v Poole*, 48 NY2d 144; *People v Session*, 34 NY2d 254; *People v Brown*, 56 NY2d 242; *People v Baxley*, 84 NY2d 208; *People v Friedgood*, 58 NY2d 467; *People v Farrell*, 207 AD2d 560; *People v Rahman*, 231 AD2d 745; *People v Robles*, 194 AD2d 750; *People v Poole*, 48 NY2d 144; *People v Machado*, 90 NY2d 187.) II. Defendant's allegations of juror misconduct, which contained no sworn allegations of fact from anyone having personal knowledge, were not sufficient to warrant a hearing. Further, defendant could not show that any outside influence was at work in the jurors' deliberations, or that defendant was prejudiced. (*People v Friedgood*, 58 NY2d 467; *People v Covington*, 44 AD3d 510; *People v Taus*, 280 AD2d 499; *People v Boddie*, 240 AD2d 155; *People v Nolan*, 268 AD2d 601; *People v Kerner*, 299 AD2d 913; *Alford v Sventek*, 53 NY2d 743; *People v Brown*, 48 NY2d 388; *People v Maragh*, 94 NY2d 569; *People v Testa*, 61 NY2d 1008.)

SMITH, J.

We hold that Supreme Court acted within its discretion in denying without a hearing defendant's post-trial motions alleging juror misconduct and a *Rosario* violation.

## I

Defendant was convicted of attempted murder, second degree assault and weapons offenses based on the shooting of Alik Pinhasov. The key witnesses at trial were Pinhasov and Jose Ramirez. Pinhasov testified that defendant shot him. Ramirez, who lived across the street from the place where the shooting occurred, testified that he heard gunshots, looked out his window and saw a man on the ground and another man—who, from Ramirez's description, was apparently defendant—holding a gun. The People also proved that the gun used to shoot Pinhasov was recovered from defendant's pocket minutes after the shooting.

Several weeks after the verdict, defendant moved to set it aside pursuant to CPL 330.30 (2), on the ground of "improper conduct on the part of a member of the jury." Supreme Court denied the motion without a hearing, and pronounced sentence. Eighteen months later, defendant moved pursuant to CPL 440.10 to vacate his conviction on the ground that the People had violated their duty under *People v Rosario* (9 NY2d 286 [1961]) by failing to turn over to defendant statements made by Ramirez to the police before trial. Supreme Court denied this motion too without a hearing. The Appellate Division affirmed defendant's conviction and sentence, and the denial of his CPL article 440 motion (*People v Samandarov*, 56 AD3d 575 [2008]). A Judge of this Court granted leave to appeal (12 NY3d 762 [2009]).

We review the decisions to deny hearings on both the CPL article 330 and the CPL article 440 motions for abuse of discretion (*People v Friedgood*, 58 NY2d 467, 470 [1983]). We conclude that discretion was not abused, and we affirm.

## II

The basis for defendant's CPL article 330 motion was an affirmation of his counsel, which in turn relied on a newspaper article and on information given to counsel by an unnamed "neighbor" said to be a "co-worker" of the foreperson of the jury.

The newspaper article mentioned in the CPL article 330 motion appeared in the New York Daily News a few days after the verdict. It suggested that there was a connection between the shooting of Pinhasov and the later murder of Pinhasov's cousin, Eduard Nektalov, who was, according to the newspaper article, "executed in broad daylight" eight months before defendant's trial. Defendant's appellate brief also relies on another newspaper article, not cited in his CPL article 330 motion, that appeared in the New York Times during the trial; that article said the Pinhasov shooting "has links" to the Nektalov murder. The Times article was not mentioned on the record at trial, but the judge may have had some warning of it: on the day before the article appeared, he said to the jurors, "I want to once again emphasize in the strongest possible terms that you are not to read about the case in tomorrow's newspapers." There is no evidence that any juror disobeyed that instruction. Nektalov's name came up only once at the trial, when a police officer testified that Nektalov served as a translator at the officer's interview with Pinhasov.

The Daily News article that appeared after the verdict reported that, though the Nektalov murder had not been mentioned at trial, "jurors said they were aware there may have been a link and that those involved . . . may have ties to mob activities." It quoted a juror as saying "Of course we were aware of it . . . and worried about it . . . . I was looking out [in the audience] thinking 'Gee, they can see all of our faces.' " According to counsel's affirmation in support of the CPL article 330 motion, counsel "confirmed" with the Daily News reporter that the article was accurate and that the juror quoted was the foreperson. Counsel also said his neighbor had told him that the jury foreperson "had discussed her jury experience with her fellow employees and again acknowledged that the jury talked about defendant's involvement with the Russian Mob throughout the trial and that the jury was preoccupied with this issue during the course of the trial." No affidavit was submitted from either the neighbor or the jury foreperson.

■ Even putting aside the hearsay nature of this evidence, Supreme Court was justified in ruling that defendant did not submit enough proof of juror misconduct to warrant a hearing. Defendant submitted nothing to show that jurors had received from outside the courtroom any information about the Nektalov murder or any other alleged "Russian Mob" activities. The evidence showed at best that jurors had speculated among

themselves that the case had "Russian Mob" connections—and the nature of the case almost invited that sort of speculation. Indeed, the danger was so obvious that defendant chose to bring it up in voir dire, mentioning a possible "perception" that "if you are a member of this group you must be involved in some sort of illegal activity" and asking if anyone had "problems or preconceived stereotypes in their minds concerning Russian-Americans." Defense counsel returned to the theme during trial, asking Pinhasov if he had any history of "loan sharking" or "money laundering." Thus, if the jurors in this case did converse among themselves about the "Russian Mob," there is no reason to think that anything outside the courtroom prompted that conversation. Absent some "outside influence" on the jurors, this record provides no ground for impeaching their verdict (see *Alford v Sventek*, 53 NY2d 743, 744 [1981]).

## III

Ramirez, whose testimony placed a gun in defendant's hand immediately after the shooting, was asked on cross-examination if anyone had interviewed him before trial. He replied: "Just the officers that came up that night [i.e. the night of the shooting] and the district attorney that came to see me." Notes of the police interview on the night of the crime were turned over to the defense as *Rosario* material. In support of his CPL article 440 motion, defendant tried to show that police officers had also taken part in one or two later interviews, and that a police officer had taken notes at those interviews that had not been turned over.

In support of his motion, defendant submitted an affidavit from Ramirez. The affidavit was typed, but contained handwritten insertions made by an investigator employed by defense counsel. The affidavit as typed says that "uniformed New York City Police Officers and two Detectives came to my apartment on two separate times and dates to conduct interviews." The handwritten insertions add the information that the police officers came "along with the District Attorney, Queens County" and say, at one point, that they came "a third time" (thus creating an apparent inconsistency in the affidavit). Typed language not changed in handwriting says that, on each of two occasions, a "Detective made hand written entries into a spiral note pad."

In opposition to defendant's motion, the People submitted a second affidavit from Ramirez, retracting some of the statements made in the first one. The second Ramirez affidavit says

that an interview by police officers, in which an officer wrote on a pad, occurred only on the night of the shooting. There were, according to the second Ramirez affidavit, two later visits from the Assistant District Attorney (ADA) responsible for the case, and on at least one of those occasions the ADA was accompanied "by two blond ladies from the District Attorney's Office." At those later meetings, according to Ramirez's second affidavit, no police officers were present and no one took notes. In explanation of his previous affidavit, Ramirez testified that defense counsel's investigator had brought him the typed version of the affidavit; that Ramirez told him it was "not correct" and that its deficiencies included "the fact that he did not mention the Assistant District Attorney's visits"; that the investigator then "wrote something on the papers about the District Attorney and . . . pressured me to sign them . . . . I signed the papers so that he would leave me alone."

Along with Ramirez's second affidavit, the People submitted several others, among them one from the ADA and one each from the "two blond ladies"—a detective investigator and a paralegal, both employed by the District Attorney's office. These three witnesses confirmed Ramirez's second account: they testified that all three of them had attended one interview with Ramirez, and that the ADA and the detective investigator had attended another. The People submitted copies of datebook entries and time sheets confirming the ADA's and the detective investigator's attendance at the interviews. The ADA, the detective investigator and the paralegal all said that no police officer was present with them at the interviews and that no one took notes. The detective investigator and the paralegal testified that they had nothing with them to write on when they attended the meetings, and the ADA said she did not possess, and never used, a spiral pad. The ADA's affidavit also explained that no police detective would have been assigned to investigate this case after the date of the incident, because, from a police department point of view, the case had been closed by arrest on the same day. To confirm this, the ADA attached a police department form, dated the date of the crime, bearing the notation: "CASE CLOSED."

■ Defendant argues that the material submitted on the CPL article 440 motion, taken as a whole, was enough to require an evidentiary hearing on the question of whether *Rosario* material—specifically, police notes of interviews with Ramirez—existed that was not turned over to the defense. We assume that

defendant would be correct if the first Ramirez affidavit had stood uncontradicted, or if only the two contradictory Ramirez affidavits were in the record. But that is not the case. The People submitted detailed proof that Ramirez was simply mistaken the first time, and the Supreme Court reasonably found that proof strong enough to make a hearing unnecessary.

Indeed, it is hard to see how Ramirez could have been correct when he said, in his first affidavit, that police officers visited him on one or two occasions in addition to their visit on the day of the crime; a contemporaneous record shows that the police closed the case that day. And the courts below reasonably discounted Ramirez's original recollection that a "Detective" took notes on a "spiral note pad" at each interview, for that was contradicted not only by Ramirez's second affidavit but by the detailed accounts of the meetings by the ADA and her two colleagues, all of whom swore that no police officer was present, and that they had no spiral pads and took no notes. The likelihood is overwhelming that Ramirez, in his first affidavit, simply erred in thinking that the police detective and the spiral pad that he saw on the day of the crime were also present at the later interviews.

It is, no doubt, theoretically possible that a hearing could show otherwise—could show the existence of suppressed *Rosario* material, in the form of handwritten notes that everyone present at the interviews says never existed. Supreme Court, however, did not abuse its discretion in finding this possibility too slim to justify the burden and expense of a hearing.

### IV

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN. (dissenting in part). In far from lucid trial testimony, the shooting victim, Alik Pinhasov, stated that on the evening of December 16, 2003 he went out in the company of three fellow members of the insular Bukharan community. As is here relevant, the group included Pinhasov, his cousin Boris and defendant. There was testimony that Boris owed Pinhasov $1,200 and that the debt had been a source of bad feeling. According to Pinhasov, the four men drank heavily, each having purchased at the excursion's outset a liter of vodka and of cognac, and as the night progressed there were flashes of temper and occasional episodes of violence. Pinhasov testified

that the evening's entertainment, such as it was, came to an end when defendant took out a gun and fired it twice, the first shot just missing Pinhasov's back and the second hitting him in the buttocks. The shots were heard by Jose Ramirez, who, according to his trial testimony, immediately went to a window of his fifth story apartment and observed, from a distance of some 50 feet, a person lying in the street being lifted by two other people. About eight feet away from this group, Ramirez observed another person in a long black coat and pants with a white stripe running down the side of each leg, yelling and waving his hands in the air. Ramirez thought he saw a gun in one of that person's hands. Ramirez's wife called 911 and the police responded. At the time of his closely ensuing apprehension, defendant was described by the arresting officers as having been clad in a leather jacket and sweat pants. A .22 caliber pistol was recovered from his person, and a firearms expert testified that the bullet removed from Pinhasov had been fired from that weapon. Ramirez was interviewed by the police after the arrest, but the extent of the People's pretrial disclosure with respect to Ramirez was a memo book entry containing Ramirez's name and pedigree information. Specific inquiry was made of Ramirez on cross-examination whether he had been asked by the investigating detective or the Assistant District Attorney for a statement, and he replied that no such request had been made.

The defense at trial was that Boris, and not defendant, had shot Pinhasov and that the gun had been handed to or picked up by defendant in the interval between the shooting and his arrest. Pinhasov, defendant urged, had accused defendant to protect his cousin who, for a period of weeks, had been held in connection with the shooting.

Shortly after the trial an article appearing in the New York Daily News reported that jurors had been aware of possible "link[s]" between the matter being tried and the murder of one Eduard Nektalov, and that one juror had stated that there was concern within the jury over the possibility of Russian mob involvement in one or both crimes.

Relying on this newspaper account, defendant moved pursuant to CPL 330.30 to set aside the verdict. He argued that the jury had been impermissibly influenced by external sources. The People responded that the motion was based on mere hearsay and that there was no indication that external influences had affected the jury's deliberative process. Rather, the People urged that the verdict turned on the properly admitted

proof tending to show that defendant, and not Boris, shot Pinhasov. The decisive evidence, claimed the People, was the testimony of Ramirez, the one witness whose motives were not shrouded by the impenetrable-seeming web of personal, business and familial relationships within the Bukharan community. In their opposition papers, the People prominently recounted that immediately after the trial and in the presence of the trial court:

> "the jury was asked, in sum and substance, by the attorney's [sic] what evidence caused them to convict the . . . defendant of the shooting. Several jurors replied, and the others nodded in acknowledgment, that it was the testimony of the independent eyewitness Jose Ramirez . . . which ultimately was found to be most compelling."

Some six months after the judgment of conviction had been rendered, Ramirez was visited by an investigator hired by defendant. At the investigator's request, Ramirez, after having had handwritten changes inserted, executed an affidavit stating in substance that he had on three occasions been interviewed by detectives and the Assistant District Attorney and that on each occasion "a Detective made hand written entries into a spiral note pad after each question." Based on this affidavit, defendant brought a CPL 440.10 motion to vacate the judgment of conviction. It was argued that the nondisclosure of the interview notes referred to in the Ramirez affidavit constituted a *Rosario* violation, and that, inasmuch as defendant was thereby prevented from effectively cross-examining a crucial prosecution witness, he had been deprived of a fair trial.

The People responded by obtaining their own affidavit from Ramirez. In this affidavit, Ramirez stated that no notes had been taken on the two occasions subsequent to the night of the crime that he had been visited by Assistant District Attorney Kane and "two blond ladies from the District Attorney's Office." He explained that he had only signed the prior affidavit because he was badgered into doing so by defendant's investigator. The People's response also included affidavits by Assistant District Attorney Kane, and, presumably, the "two blond ladies" mentioned for the first time in Ramirez's second affidavit, Detective Investigator Elizabeth Curcio and a paralegal in the District Attorney's office named Joanna Fiorentini. All stated that they had participated in interviews with Ramirez but that no notes had been taken.

The motion court found that, in light of Ramirez's recantation and what the court referred to as "the People's substantial evidentiary showing" of what had occurred during the investigatory interviews of Ramirez, no issue of fact had been raised as to the existence of undisclosed *Rosario* material by the initial Ramirez affidavit. The court also was of the view that, even if there had been a *Rosario* violation, there was no reasonable possibility that it affected the outcome of the trial. The Appellate Division affirmed in a brief decision and order (56 AD3d 575 [2d Dept 2008]).

While I am in agreement with the majority that defendant's CPL 330.30 motion was correctly denied, since there was no showing that the verdict was attributable to any outside influence, I part with the majority respecting the propriety of the summary denial of defendant's CPL 440.10 motion.

Ordinarily, when there are conflicting affidavits on a material matter a triable issue turning on credibility inappropriate for summary resolution is raised. This case presents no occasion to depart from this basic rule of proceeding. Indeed, the governing statute, CPL 440.30, specifically requires an evidentiary hearing where, as here, defendant's allegations are not insufficient as a matter of law to establish the alleged violation (*see* CPL 440.30 [4] [a], [b]); are not "conclusively refuted by unquestionable documentary proof" (CPL 440.30 [4] [c]) or "contradicted by a court record or other official document," or "made solely by the defendant and [without support] by any other affidavit or evidence" (CPL 440.30 [4] [d] [i]); and there are no other grounds to conclude that "there is no reasonable possibility that [defendant's allegation of a *Rosario* violation] is true" (CPL 440.30 [4] [d] [ii]; *see People v Baxley*, 84 NY2d 208, 214 [1994]).

While the majority, presumably in an attempt to satisfy the last of these dispensational factors (the others plainly being unavailable), labor to show that Ramirez's first affidavit must have been a mistake, the proposition is difficult to embrace on this record, much less as a matter of "overwhelming" likelihood (majority op at 440). Before us are two affidavits by the same affiant evidently contradictory in a crucial respect—in one, which the affiant apparently took care to read and correct where he thought emendation was necessary, the affiant purports to recollect with a fair degree of specificity that his statements were recorded by a detective on three occasions in a spiral notebook; in the other, he states that none of this happened. All that would appear "overwhelmingly" likely on this record is that these

affidavits are inconsistent. There appears no ground upon which one deliberately prepared and executed sworn statement might be dismissed as "mistaken" and the other embraced as true.

Ramirez may well have wished to be rid of defendant's investigator, but that motive, without more, does not adequately explain his execution of an affidavit seemingly at odds with his trial testimony that no statement had been taken from him. Nor are the circumstances of his recantation of the affidavit, nearly a year after signing it, set forth. The record does not disclose, for example, whether, as would seem likely, the detective from the District Attorney's office who obtained the recanting affidavit explained to Ramirez that his original affidavit, if not recanted, raised, at the very least, the possibility of a new trial at which he would be called upon to testify all over again and at which he would be impeached on the basis of his affidavit and prior testimony. Indeed, there is no reason to suppose that Ramirez was not at least as eager to be rid of the District Attorney's minion as he had been to be rid of the defendant's. In addition, while there were affidavits before the motion court affirming that the trial assistant, Ms. Kane, and two associates from the District Attorney's office had not, during their interviews of Ramirez, taken a single note, these submissions, even if accepted at face value, do not exclude the possibility of undisclosed recorded statements from Ramirez since, as defendant points out, Ms. Kane entered the prosecution late, succeeding the originally assigned ADA after an earlier *Rosario* violation, and investigators other than the affiants had been involved in the development of the prosecution's case.

For the foregoing reasons, the motion court's conclusion that no triable issue had been raised as to whether there were undisclosed prior statements by Ramirez bearing upon the subject matter of his testimony appears to have been unwarranted. Even more unwarranted was the motion court's view that, even if such statements existed, there was no reasonable possibility that they could have affected the trial's result. Without knowing the content of any such statements, it is manifestly impossible to say whether they could have been used by the defense to raise a reasonable doubt as to defendant's commission of the shooting. It is true that the sufficiency of the People's case did not depend on Ramirez's testimony. But the strength of the case, as distinguished from its sufficiency, concededly did. Pinhasov's account of the shooting and the antecedent events was, to say the least, not a model of clarity, and a significant issue

evidently remained after his delayed accusation,* and after his testimony, as to whether his shooting had not actually been the drunken work of his debtor cousin Boris, with whom Pinhasov was "very close," but who, according to Pinhasov, immediately after the shooting stood over Pinhasov enraged, screaming that Pinhasov was "vomit" and "garbage." It was Ramirez's testimony that seemed to crystalize the situation for the jury, and resolve doubts naturally remaining in the wake of Pinhasov's account, in favor of convicting defendant. In view of the pivotal importance of Ramirez's testimony—a circumstance the majority completely elides—it does not seem possible to say that nothing he could have said during the shooting's investigation as to what he saw, or thought he saw, or did not see from his fifth story window in the small hours of the morning of December 17, 2003, could possibly have been used by defense counsel to alter the trial's course in defendant's favor.

Where "a defendant can articulate a factual basis for the assertion that a prosecutor is improperly denying the existence of [Rosario material]," the court is bound to determine whether such material exists (see People v Poole, 48 NY2d 144, 149 [1979]). Here, such a factual basis was presented and it does not appear that its truth can be tested except by an evidentiary hearing. It is, of course, perfectly accurate to say as the majority does that it is "theoretically possible that a hearing could show . . . the existence of suppressed Rosario material" (majority op at 440). But this is not a rationale for dispensing with a hearing; it is precisely because the possibility of suppressed Rosario material has been shown to exist that a hearing must be had (see CPL 440.30 [5]). The possibility of suppressed Rosario material is only theoretical because it has not been tested.

Accordingly, I would reverse the order denying the CPL 440.10 motion and grant the motion to the extent of directing a hearing to determine whether there exists or existed undisclosed Rosario material pertinent to Mr. Ramirez's trial testimony and, if so, whether the nature of any such material raises a reasonable possibility that its nondisclosure materially affected the trial's outcome (see CPL 240.75; and see People v Baxley, 84 NY2d 208 [1994]).

---

* Pinhasov evidently did not implicate defendant when the police arrived immediately after the shooting and the issue, despite the "CASE CLOSED" notation upon which the majority places such emphasis, was sufficiently unclear that Boris was held for weeks in connection with the shooting.

Judges CIPARICK, GRAFFEO, READ and JONES concur with Judge SMITH; Chief Judge LIPPMAN dissents in part in a separate opinion in which Judge PIGOTT concurs.

Order affirmed.