■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CLIFFORD JONES, Appellant. [970 NYS2d 509]—

Order, Supreme Court, New York County (James A. Yates, J.), entered on or about October 19, 2010, which denied defendant's CPL 440.10 motion to vacate a judgment of conviction of the same court (Alfred Kleiman, J.), rendered July 6, 1981, affirmed.

Defendant has not established that the newly discovered DNA evidence "is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to [him]" (CPL 440.10 [1] [g]). Defendant was convicted of the murder of one person and the rape of another person during a 1980 incident. Thirty years later, mitochondrial DNA testing of 3 of 18 hairs retrieved from a hat left at the scene by the perpetrator, and of fingernail scrapings from the murder victim, indicated that neither the tested hairs nor the fingernail scrapings were defendant's. We find, however, that a new trial would not be warranted even if such evidence were accepted as proof that the hairs and scrapings originated from a person or persons other than defendant.

The sole identifying witness was the rape victim. Although defendant points out a few weaknesses in the People's case (such as the victim's drug use), her lineup and in-court identifications of defendant were unusually strong and reliable. She observed defendant and conversed with him for about 15 minutes under good lighting conditions, at a time when defendant had not yet displayed a weapon and the situation had not yet become stressful. She provided a detailed description that included the condition of defendant's teeth (one tooth, she testified, was "chipped and he had a gap between his teeth"). At the close of the People's case, defendant was directed, over objection, to display his teeth to the jury. Tellingly, defense counsel

made no mention of the teeth during his summation, but the prosecutor, in his closing argument, highlighted this point, without objection from the defense.[1] A police report in the record, dated June 2, 1980 (the date of the crime), states that the victim described the perpetrator as having "spaces between teeth [and] one tooth chipped in front."

Given the strength of the evidence, the two portions of the DNA evidence, even when viewed collectively, would not have created the probability of a more favorable verdict. There are multiple explanations for the presence of hairs other than defendant's on the hat found at the scene. Most obviously, the hairs could have belonged to a person other than the perpetrator who wore the hat before the incident. In fact, given that the laboratory that tested the hairs on defendant's behalf noted in its report that the hairs were not all of the same color, and that only 8 of the 18 hairs were curled, there is good reason to believe that the hairs did not all come from the same individual.[2] Moreover, as the People point out, it is not clear from the 1981 laboratory report's ambiguous description of certain hairs (including those tested by defendant) as being from "under [the] hat band" that the hairs came from inside the hat (and, thus, from a person who wore it); indeed, the same report described other hairs (not tested by defendant) as being from "inside" the hat. In this regard, the hat was given to the police after the crimes by a civilian who had handled it. As for the fingernail scrapings, the trial evidence did not establish that the murder victim scratched his assailant, and there were potential alternative sources for the DNA material under his fingernails.

Defendant urges that a hearing was required to resolve the parties' factual disputes concerning the reliability of the mitochondrial DNA evidence. In deciding a CPL 440.10 motion, a hearing to develop additional facts is not "invariably necessary"; rather, CPL 440.30 contemplates that a court will make an initial determination on the written submissions whether the motion can be decided without a hearing (*People v Satterfield*, 66 NY2d 796, 799 [1985]). Here, we find that even if the reliability of the evidence is assumed, defendant still did not establish a legal basis for ordering a new trial. Accordingly, the factual disputes in this case were not material, and defendant was not prejudiced by the absence of a hearing.

---

1. The prosecutor argued to the jury: "She described him down to his teeth. It's in the record; spaces between his teeth and a chipped tooth.

"Well, the defendant stood up before you this morning and he opened his mouth and you saw, I submit, the spaces between his teeth. This is part of the record; it's evidence like any other evidence."

2. In addition, one nonhuman (probably feline) hair was found on the hat.

In taking the position that the motion should not have been denied without a hearing, the dissent relies on the People's failure to submit in admissible form their expert analysis impeaching the integrity of the testing procedures performed on the hairs by the commercial laboratory defendant engaged and the conclusiveness of the results of that testing.[3] In so doing, the dissent simply assumes that the results of the testing of the hairs from the hat proffered by defendant, taken at face value, would have "create[d] a probability that . . . the verdict would have been more favorable to the defendant" had those results been placed in evidence at trial (CPL 440.10 [1] [g]). As previously noted, however, the test results, assuming their accuracy for present purposes, prove, at most, only that 3 of the 18 hairs retrieved from the hat that the perpetrator wore while committing the crimes came from an individual other than defendant. Needless to say, even if the testing results are taken at face value (as we must do at this juncture), this is far from conclusively exculpatory evidence.

Contrary to the dissent's deprecation of the rape victim's identification of defendant, this was a very strong eyewitness identification case. The victim interacted with the perpetrator for 15 minutes in a transaction that was initially nonviolent and consensual, and she observed the perpetrator's face at close quarters in broad daylight. Any discrepancies in the victim's descriptions of the perpetrator (for example, concerning his hairstyle or skin tone) were of the kind that ordinarily arise in criminal trials; the defense argued these points to the jury, which found them unpersuasive. Moreover, far from lacking corroboration, the victim's identification of defendant was corroborated by the appearance of his teeth when displayed at trial. Viewing the evidence in the light most favorable to the People, we must infer from the jury's verdict that the appearance of defendant's teeth was consistent with the descriptions the victim gave to the police and in her testimony.[4]

Given the strength of the evidence against defendant, there is no reason to believe that the results of testing 3 strands of hair (out of 18 retrieved from the hat worn by the perpetrator) would have resulted in a verdict more favorable to defendant had those

---

**3.** While the People's objections to the testing results proffered by defendant (to which defendant offered no expert rebuttal) would have sufficed to support summary denial of the motion had they been presented by way of an expert affidavit, the dissent is correct to the extent it argues that the People's expert analysis cannot provide the basis for denying the motion until it is presented in admissible form.

**4.** Notably, defendant was directed to display his teeth to the jury only after the court itself first viewed defendant's teeth.

results been received into evidence at trial.[5] Again, since the source of the hairs could have been anyone who wore or handled the hat before the crimes were committed, or a person who handled the hat thereafter (including the civilian who turned it over to the police), the perpetrator was not necessarily the source of the hairs that were tested (see *Steward v Grace*, 362 F Supp 2d 608, 622 [ED Pa 2005] [defendant was not entitled to DNA testing of a hair sample from a jacket worn by the perpetrator during the commission of the crime because "the hair could have ended up on the jacket in numerous ways either before or after the murder"]; *People v Smith*, 245 AD2d 79 [1st Dept 1997] [even if DNA testing would show that semen from a rape kit was not defendant's, that result would not have affected the verdict because the victim testified that she had engaged in intercourse with her boyfriend shortly before the rape and that she did not know whether defendant ejaculated during the rape], *lv denied* 92 NY2d 861 [1998]). Moreover, to reiterate, 15 of the hairs from the hat were not tested—not due to any objection by the People, which provided all 18 hairs to defendant, but presumably by choice of his counsel—and there is no reason to assume that defendant was not the source of some or all of the untested hairs (see *Brown v Mississippi*, 2011 WL 4386453, *5, 2011 US Dist LEXIS 106907, *15 [ND Miss 2011] [DNA testing did not exculpate petitioner where testing of several hairs "produced inconclusive results, and many others were not tested at all" (emphasis deleted)]).[6]

Finally, the dissent overlooks the fact that CPL 440.10 (1), by providing that the trial court "may" grant a motion to vacate a conviction based on newly discovered evidence, entrusts the determination of such a motion to the court's discretion (see *People v Samandarov*, 13 NY3d 433, 436 [2009] [Court of Appeals reviews decisions to deny hearings on CPL article 440 motion "for abuse of discretion"]). On this record, we find that the trial court providently exercised its discretion in summarily denying defendant's motion. Concur—Gonzalez, P.J., Friedman and DeGrasse, JJ.

Moskowitz and Freedman, JJ., dissent in a memorandum by Freedman, J., as follows: I respectfully dissent, because I believe the motion court should have granted defendant further DNA testing and held an evidentiary hearing before determining his

---

**5.** We note that the dissent does not rely on the results of the testing of the material retrieved from the fingernails of the murder victim.

**6.** It is not clear why the dissent believes that Supreme Court should have ordered "further DNA testing." The People voluntarily provided defendant with all 18 hair samples from the hat.

motion under CPL 440.10. In 1981, defendant was convicted in connection with a heinous criminal event. He served three decades in prison before being paroled. He has consistently maintained his innocence and desire to clear his name. In 2010, new DNA tests indicated that defendant was not the source of hair samples that were obtained from the perpetrator's hat. This evidence, coupled with the fact that the People's case against defendant relied solely on a single eyewitness identification some four months after the incident, was, I believe, sufficient for the motion court to grant the application for further DNA testing and an evidentiary hearing.*

Defendant was convicted of raping a woman, R, and stabbing to death a man in an apartment building on the afternoon of June 2, 1980. R, a heroin addict who had taken the drug earlier that day and was supporting herself as a prostitute, had entered the building with the assailant to find a place to engage in sexual activity. When police officers arrived at the crime scene after the assailant fled, R described him to the officers as a brown-complexioned male wearing a baseball cap, with an Afro hairstyle, a chipped tooth, and a gap between his teeth. The blood-covered cap that the assailant wore was recovered from the ground floor of the building.

R was treated at a hospital, where a rape kit consisting of fluids and other physical evidence was prepared. When police officers questioned R at the hospital, she at one point repeated that her assailant had an Afro hairstyle but at another point said he wore braids.

On September 24, 1980, R identified defendant from a photo array. On October 25, 1980, defendant voluntarily appeared at a precinct house and participated in a lineup. On that day, defendant wore neither an Afro hairstyle nor braids. R identified him at the lineup. At a pretrial suppression hearing, R acknowledged that she was under the influence of heroin when she made both identifications.

The trial commenced in April 1981. The People were not able to introduce any physical evidence connecting defendant with the rape or murder. In fact, none of the items introduced into evidence, which included the perpetrator's baseball cap, the bloody knife, blood scrapings, and the rape kit, connected defendant with the crimes. The People relied solely on R's courtroom identification of defendant as the assailant. At the People's request, as part of its case, and over defense counsel's objection,

---

* The Innocence Project, which provides legal and related services to indigent prisoners who may be exonerated by post-conviction DNA evidence, has filed a brief as amicus curiae on behalf of defendant.

defendant showed his teeth to the jury. The trial record does not include any description of defendant's teeth.

On April 15, 1981, the jury found defendant guilty of first-degree rape, second-degree murder, and first-degree attempted robbery, and in July 1981, he was sentenced to an indeterminate prison term of 18 years to life on the murder count and concurrent lesser sentences on the remaining counts. This Court affirmed, and the Court of Appeals denied leave to appeal (91 AD2d 874 [1st Dept 1982], *lv denied* 58 NY2d 1119 [1983]). He served nearly 30 years before being paroled.

In 2008, defendant moved under CPL 440.30 (1-a) (a) (1) for postconviction forensic DNA testing of any existing physical evidence. In response, the People searched their records and reported that the majority of the physical evidence, including the rape kit and the knife, had been destroyed. However, the People located and produced two pieces of physical evidence, namely, 18 fragments of human hair from the assailant's baseball cap and scrapings from under the murder victim's fingernails. Thereafter, the People permitted defendant to engage a private laboratory at his own expense to test three hair fragments using mitochondrial DNA (mtDNA) analysis, a sophisticated identification technique that had been developed after defendant's trial and conviction. This process analyzes the genetic material found in the mitochondria within a subject's cells, which material is inherited directly from the subject's mother. Under ideal conditions, mtDNA testing can restrict the possible source of genetic material to one individual and his or her maternal ancestors.

The laboratory compared the three hair fragments from the baseball cap with a sample of defendant's hair. In a February 2010 report, the laboratory concluded that while all three fragments probably came from the same person, the hair could not have been defendant's.

In April 2010, defendant moved under CPL 440.10 for an order vacating his judgment of conviction and directing a new trial on the ground that the mtDNA test results constituted newly discovered exculpatory evidence that could with reasonable probability have changed the verdict. Defendant argued further that R's identification at trial was unreliable and outweighed by the mtDNA evidence.

Defendant also relied on the Office of the Chief Medical Examiner's new DNA test of the fingernail clippings from the murder victim. The test revealed that one clipping contained DNA from the victim and at least one unidentified person, but none of defendant's DNA. Three other fingernail clippings

indicated DNA that was consistent with the victim's, but the examiner could not draw any conclusion about the source of any other DNA.

In opposition, the People argued that the laboratory's mtDNA analysis was flawed and its results were inconclusive. The People stated in their papers that two experts had reviewed the laboratory's findings at the prosecutor's request and found that the laboratory's testing methodology deviated from accepted scientific protocols and the laboratory manipulated the data to reach a favorable conclusion for defendant. No affidavits by the experts were submitted.

In its October 2010 order, the motion court summarily denied the CPL 440.10 motion without conducting an evidentiary hearing, on the ground that defendant's new evidence probably would not have produced a different trial result (*see People v Salemi*, 309 NY 208, 216 [1955], *cert denied* 350 US 950 [1956]). Accepting the People's criticisms of the mtDNA tests, the court rejected the significance of the results, finding they had "limited evidentiary value" and failed to exonerate defendant. The court added that even if the results showed that the three tested hairs were not defendant's, the hairs "[did] not constitute a common pool of evidence" because 15 other hairs from the hat were not tested. As to defendant's argument that the DNA evidence undermined R's credibility, the court noted that R had identified defendant more than once and given a description that, despite some discrepancies, "capture[d] his features in a general way."

Defendant's conviction was based solely on an identification by a single witness nearly four months after the event. That witness provided various inconsistent descriptions of the perpetrator immediately after the incident. Defense counsel explored some of the weaknesses of the identification at trial. However, the physical evidence did not connect defendant to the crimes, and another witness to the crime was unable to identify defendant as the perpetrator.

New York courts have recognized the unreliability or fallibility of eyewitness identification and the danger of allowing it to be the sole basis for a criminal conviction (*see e.g. People v LeGrand*, 8 NY3d 449 [2007]; *People v Abney*, 13 NY3d 251 [2009]; *People v Russell*, 99 AD3d 211, 215 [1st Dept 2012]; *State v Henderson*, 208 NJ 208, 27 A3d 872 [2011]).

CPL 440.10 (1) (g) provides for vacatur of a conviction based on newly discovered evidence "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant." If

the defendant produces post-conviction evidence favorable to him or her, CPL 440.30 (5) requires the court to "conduct a hearing and make findings of fact essential to the determination [of the motion]." Only in limited circumstances where the defendant has failed to make a prima facie showing can the motion be summarily denied.

Here, defendant met his initial burden by offering sworn evidence of mtDNA analysis showing that the hairs from the perpetrator's hat were not his. The rebuttal offered by the People, in the form of an attorney's affirmation containing hearsay statements questioning the reliability of the mtDNA test results, is insufficient to discredit defendant's evidence. The question whether, as the People claim, the laboratory's procedures were flawed or its results were inconclusive is an issue of fact, and should not have been summarily determined. Rather, the parties should have been provided the opportunity to present expert testimony to explain or challenge mtDNA testing and the laboratory's specific test procedures and results. Accepting defendant's proposal to have the remaining hairs tested would have produced extremely useful information for the court.